991 F.2d 791
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas L. EWING, Defendant-Appellant.
 No. 92-5395.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 3, 1993
Decided: April 26, 1993
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Durham. Frank W. Bullock, Jr., Chief District Judge. (CR-90-152-D)
 James B. Craven, III, Durham, North Carolina, for Appellant.
 Benjamin Harvey White, Jr., Assistant United States Attorney, Greensboro, North Carolina, for Appellee.
 Robert H. Edmunds, Jr., United States Attorney, Greensboro, North Carolina, for Appellee.
 M.D.N.C.
 AFFIRMED.
 Before WIDENER and LUTTIG, Circuit Judges, and PAYNE, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 This case is before us for a second time. In United States v. Ewing, 957 F.2d 115, 120 (4th Cir.), cert. denied, 60 U.S.L.W. 3859 (U.S. 1992), we remanded the question of the extent of restitution for further fact finding as required by 18 U.S.C § 3664(a) and our decision in United States v. Bruchey, 810 F.2d 456 (4th Cir. 1987). After a hearing the district court affirmed the original award of $52,567.26 and then reduced it to $25,000 based upon Ewing's ability to pay. Finding no abuse of discretion in the district court's award of restitution, see Bruchey, 810 F.2d at 458, we affirm.
 
 
 2
 Thomas L. Ewing was the sole owner and operator of CHEM-TLE Environmental Services, Inc. (CHEM-TLE). See Ewing, 957 F.2d at 116. In September 1987 the United States Environmental Protection Agency (EPA) made CHEM-TLE a regional hazardous waste cleanup operator. See 957 F.2d at 116. The EPA awarded CHEM-TLE a regional operator contract based on the fact that CHEM-TLE represented that one Ken Wilcox, a qualified expert in the disposal of toxic wastes, would be the quality assurance manager on all its clean-up projects. See 957 F.2d at 116. A qualified quality assurance manager is essential to the EPA's award of regional operator contracts because the quality assurance manager is responsible for assuring that all clean-up and remedial operations comply with Super Fund Program standards.
 
 
 3
 Shortly after becoming a regional operator CHEM-TLE was assigned to clean up a hazardous waste site in Lexington, Kentucky. See 957 F.2d at 116. CHEM-TLE completed the clean-up and billed the EPA $52,567.26 for quality assurance program expenses. See 957 F.2d at 116. Upon conducting a review of CHEM-TLE's billings, the EPA discovered that Wilcox had not been the quality assurance manager on the Lexington clean-up project and had never been hired because he had refused CHEM-TLE's offer of employment. See 957 F.2d at 116.
 
 
 4
 Subsequently, Ewing was charged with a two-count indictment for submitting false claims to the government in violation of 18 U.S.C. §§ 287 and 2. See 957 F.2d at 116. Ewing pled guilty to submitting a false claim for quality assurance expenses, and the district court accepted the plea and dismissed count two of the indictment without opposition from the government.[1] See 957 F.2d at 116-17. After denying a pro se motion by Ewing to withdraw his guilty plea, the district court sentenced Ewing to ten months' imprisonment and ordered restitution in the amount of $52,567.26. See 957 F.2d at 117. On appeal we affirmed the denial of the motion to withdraw the guilty plea but remanded the award of restitution for further fact finding. See 957 F.2d at 119-20. On remand the district court affirmed the original award of restitution and then reduced it to $25,000 based upon Ewing's ability to pay. Ewing now appeals.
 
 
 5
 In Bruchey, we held that a district court is required to make specific findings of fact when awarding restitution under § 3664(a). See 810 F.2d at 458.[2] Section 3664(a) states:
 
 
 6
 The court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.
 
 
 7
 18 U.S.C § 3664(a). Specific fact finding allows us to determine whether the district court abused its discretion in balancing "the victim's interest in compensation against the financial resources and circumstances of the defendant-all while remaining faithful to the usual rehabilitative, deterrent, retributive and restrictive goals of criminal sentencing." 810 F.2d at 458.
 
 
 8
 Although the district court did not issue a memorandum stating its specific findings of fact, the district court did state its findings on the record. The district court first addressed the amount of loss sustained by the EPA and found it to be $52,567.26 based upon an invoice from CHEM-TLE to the EPA for quality assurance program expenses from October to December 1987. The EPA issued CHEM-TLE a check for $59,045.81 to pay this invoice and another invoice of $6,478.55 for other services.[3] Ewing contested the amount of the loss, claiming that restitution of $52,567.26 would allow the EPA to receive a windfall because the EPA would pay nothing for the completed clean-up. Ewing then claimed that the loss should be $16,250, which represented three months of Wilcox's annual $65,000 salary,[4] because the remaining $36,317.26 represented other quality assurance costs for which the EPA should be liable. The district court rejected this argument, holding that the EPA paid $52,567.26 for a quality assurance program administered by Wilcox. Wilcox did not conduct the program and thus the EPA did not receive the quality assurance for which it had contracted.
 
 
 9
 We are of opinion that the district court did not abuse its discretion in setting the amount of the loss at $52,567.26. The invoice to the EPA stated that the $52,567.26 was for three months of the quality assurance program at $17,522.42 per month. The EPA paid the invoice believing that Wilcox had been in charge of the program. In paying the invoice, the EPA was paying not only for the expenses of clean-up but also for the assurance that all the operations complied with the Super Fund regulations. Because Wilcox was never hired, the EPA did not receive the quality assurance for which it paid. Although Ewing employed another quality assurance manager, Ewing neither notified the EPA of this change nor obtained EPA approval of the substitution as part of the quality assurance contract.
 
 
 10
 The district court then addressed Ewing's ability to pay the amount of restitution. Testimony from Ewing indicated that he had some health problems but had a work expectancy of 20 years, had two years of college education, and was enrolled in paralegal school. While the testimony also revealed that Ewing had several outstanding debts, including back child support, medical bills, loans from family, and unsecured credit card balances, the district court found that Ewing presumably would obtain a reasonably well-paying job either as a paralegal or as something else. Based on these facts, the district court stated:
 
 
 11
 While I feel very strongly that the defendant should be required to reimburse the government in the total $52,567.26 amount, out of concern for the back child support and the medical expenses which may be reoccurring, the Court finds that over a period of time the defendant could realistically pay $25,000.00, but no more.
 
 
 12
 The district court then ordered Ewing to pay restitution in monthly amounts to be determined by the probation office.[5]
 
 
 13
 Ewing contests the amount of restitution, claiming that the evidence concerning his ability to pay is insufficient. In support of his claim, Ewing relies on two Tenth Circuit cases dealing with restitution orders. In United States v. Kelly, 929 F.2d 582 (10th Cir.), cert. denied, 60 U.S.L.W. 3309 (U.S. 1991), the Tenth Circuit vacated a restitution award stating, "We find nothing in the pre-sentence report which supports the statement that because of possible future employment opportunities and entrepreneurial skill, Kelly, at some future date after her release from prison, would be able to repay $192,092." 929 F.2d at 587. In United States v. Rogat, 924 F.2d 983 (10th Cir.), cert. denied, 59 U.S.L.W. 3724 (U.S. 1991), the Tenth Circuit upheld a restitution order of $2,449,142.48 stating,
 
 
 14
 Balanced against the appellants' current indigency, the [district] court found "the defendants both very able, intelligent, well-educated, talented business people, who do have a substantial capacity to earn money now or in the future, and therefore, do have the ability to make restitution." We cannot find these factual conclusions clearly erroneous.
 
 
 15
 924 F.2d at 986. In discussing these two decisions, Ewing likens his situation to that of Kelly and urges us to reverse the award of restitution or remand for further fact finding on his ability to pay.
 
 
 16
 We are not persuaded by Ewing's argument. In Rogat, the Tenth Circuit stated, "A restitution order will be upheld if the evidence indicates a defendant has some assets or earning potential and thus possibly may be able to pay the amount ordered." 924 F.2d at 985. The Tenth Circuit then upheld the award of restitution because the district court's findings concerning the defendants' substantial earning potential were not clearly erroneous. See 924 F.2d at 986. Although the district court did not find that Ewing has substantial future earning potential, the district court did find that Ewing's college education and paralegal training made it reasonably certain that he would obtain a well-paying job and possibly be able to pay the restitution ordered. We are of opinion that this is all that is required under Rogat.
 
 
 17
 In Kelly, the Tenth Circuit vacated the award of restitution based on its holding in Rogat. See Kelly, 929 F.2d at 587. However, the factual distinctions between Kelly and this case are fatal to Ewing's argument. In Kelly, the district court sentenced the defendant, who was 60 years old at the time, to 50 months imprisonment and ordered restitution of $192,092. See 929 F.2d at 587. The Tenth Circuit vacated the award because the pre-sentence report contained no evidence of possible employment opportunities which would enable the defendant to pay a "restitution order of this magnitude." 929 F.2d at 587. In contrast to Kelly, the restitution order in this case is $25,000 and not $192,092. Furthermore, the evidence presented at the hearing indicates that Ewing is 45 years old, has a work expectancy of 20 years, was sentenced to only 10 months imprisonment,[6] and has a reasonable expectation of future earnings based upon his college education and paralegal training.
 
 
 18
 We are of opinion that the district court did not abuse its discretion in setting final restitution at $25,000.[7] The district court based its decision on a reasonable expectation of Ewing's future earning potential due to his college education and current paralegal training. We are of opinion that these factual findings are not clearly erroneous and that the possibility of repayment in this case is not based solely on chance. See Rogat, 924 F.2d at 985. Despite Ewing's other obligations, we are of opinion that it is reasonable to expect that he will obtain a good job after finishing paralegal school and will be able to make monthly payments towards his restitution.
 
 
 19
 Accordingly, the decision of the district court is
 
 
 20
 AFFIRMED.
 
 
 
 [1]
 Count one concerned the false claim for quality assurance program expenses. See 957 F.2d at 116. Count two concerned a false claim for reimbursement of a pollution liability insurance premium that CHEMTLE never paid. See 957 F.2d at 116
 
 
 [2]
 Bruchey was decided under 18 U.S.C. § 3580, which was the statute authorizing restitution orders at the time. The Sentencing Reform Act of 1984, Pub. L. No. 98-473 § 211, 98 Stat. 1987, renumbered § 3580 as 18 U.S.C. § 3664
 
 
 [3]
 When we first considered the amount of restitution we noted that the amount of restitution was $52,567.26 but that the pre-sentence report, paragraph 16, indicated that the EPA only paid $52,016.26. Ewing, 957 F.2d at 116 n.1. Neither party addressed this lower figure on remand, but we are of opinion that the district court's findings indicate that the EPA actually paid the full $52,567.26. Apparently the first time the case was here the difference resulted from the pre-sentence report
 
 
 [4]
 From the transcript it is apparent that $65,000 was the annual salary that CHEM-TLE had offered to pay Wilcox as an employee; it was not a salary figure set by the EPA
 
 
 [5]
 Prior to the hearing Ewing had been paying $50 per month towards restitution
 
 
 [6]
 The record indicates that Ewing has already served his prison term and is now on supervised release
 
 
 [7]
 While the district court might have accepted the lower figure of $16,250 advocated by Ewing, it neither abused its discretion nor was clearly erroneous in setting the $25,000 figure that it did